**CHASE MANHATTAN BANK, USA, N.A., Plaintiff,**

v.

**FREEDOM CARD, INC. and Urban Television Network, Inc., Defendants/Third Party Plaintiffs,**

v.

**J.P. MORGAN CHASE & CO. and JP Morgan Chase Bank, Third Party Defendants.**

No. CIV.A.03–217–KAJ.

United States District Court, D. Delaware.

Aug. 26, 2004.

Richard D. Allen, Esquire and James G. McMillan, III, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, counsel for Plaintiff. Of counsel: Ethan Horwitz, Esquire, Leonard F. Lesser, Esquire, and Kandis M. Koustenis, Esquire, Goodwin Procter LLP, New York City.

David A. Jenkins, Esquire, Roger D. Anderson, Esquire, and Joelle E. Polesky, Esquire, Smith, Katzenstein & Furlow LLP, Wilmington, DE, counsel for Defendants. Of counsel: Bill Campbell, Esquire, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, Stuart, FL.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. INTRODUCTION

This is a trademark infringement case. Jurisdiction is proper under 28 U.S.C. § 1331. Presently before me is a Motion for Summary Judgment filed by the third-party defendants J.P. Morgan Chase & Co. and JPMorgan Chase Bank (collectively, "Chase"). (Docket Item ["D.I."] 329; the "Motion".) Also before me is Chase's Motion to Exclude the Expert Testimony of Michael F. Maloney. (D.I.330.) The defendants and third-party plaintiffs in this case, FreedomCard, Inc. ("Freedom-Card") and Urban Television Network,

Inc. ("UTN")[1] have filed a Motion to Consolidate and Realign the Parties for a Jury Trial on the Trademark Infringement Claim and to Strike an Expert Opinion as Untimely (D.I.323) and a Motion to Exclude the Expert Report of Pierce Sioussat (D.I.326). For the reasons that follow, Chase's Motion will be granted in part and denied in part and the remaining motions will be denied as moot.

## II. BACKGROUND

### A. *Procedural Background*

J.P. Morgan Chase & Co. is a Delaware corporation with its principal place of business in New York, New York. (D.I. 37 ¶ 36.) JP Morgan Chase Bank and Chase Manhattan Bank, USA, N.A. ("Chase USA") are wholly owned subsidiaries of J.P. Morgan Chase & Co. (D.I. 37 at ¶¶ 71–74.) JP Morgan Chase Bank is a New York corporation with its headquarters in New York City. (*Id.*) Chase USA is a national association organized under the laws of the United States and has its headquarters in Delaware. (*Id.;* D.I. 1 ¶ 2.) UTN and FreedomCard are Delaware corporations, both with their principal place of business in Marina Del Ray, California. (*Id.* ¶¶ 3, 4; D.I. 37 ¶¶ 34, 35.) UTN owns U.S. Trademark Registration Nos. 2,398,191 and 2,398,192 for "FREEDOM CARD" in International Class 36 for credit card services, and in International Class 16 for credit cards, respectively. (D.I. 37 ¶¶ 45, 46.) Both registrations were issued on October 24, 2000. (*Id.*) FreedomCard is the exclusive licensee of the FREEDOM CARD marks. (*Id.* ¶ 48.)

On February 4, 2003, Chase USA filed this action seeking a declaratory judgment that "its use of the word 'freedom,' in combination with Chase's well-known CHASE mark on credit cards issued by Chase as CHASE FREEDOM credit cards, does not infringe" any of UTN's trademark rights. (D.I. 1 at ¶ 1.) Chase USA also seeks a declaratory judgment that it has not breached a 1999 Mutual Confidentiality Agreement between Chase USA and FreedomCard. (*Id.*) In response to Chase USA's complaint, UTN brought counterclaims against Chase USA and a third-party complaint against Chase for trademark infringement and unfair competition under the Lanham Act and New York and Delaware law.[2] (*See* D.I. 37.) Chase filed its Motion for Summary Judgment on May 3, 2004. (D.I.329, 332.)

### B. *Factual Background*[3]

UTN launched the FREEDOM CARD credit card, in conjunction with CompuCredit Corporation, in December 2000,[4] to

---

1. Unless otherwise indicated, FreedomCard and UTN will be referred to collectively as "UTN" in this Memorandum Opinion and the accompanying Order.

2. UTN filed its answer, counterclaims, and third-party complaint after I enjoined UTN from pursuing a second-filed action in the United States District Court for the Southern District of New York (the "New York Action"). (*See* D.I. 28; reported at *Chase Manhattan Bank USA, N.A. v. Freedom Card, Inc.*, 265 F.Supp.2d 445 (D.Del.2003).) The New York Action was transferred to this court on April 29, 2003, where it remains enjoined and stayed. (*See* D.I. 17 in *Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, Civil Action No. 03-

432–KAJ.) On April 26, 2004, UTN moved to consolidate the New York Action with this case. (D.I.324.) For the reasons set forth herein, UTN's Motion to Consolidate will be denied as moot.

3. The information in this section is taken largely from the parties' pleadings (D.I.1, D.I.37). Some of it is based upon the undisputed facts recited in the parties' summary judgment briefing. (*See* D.I. 332 at 3; D.I. 343 at 3).

4. CompuCredit stopped marketing and issuing new accounts for the FREEDOM CARD credit card after December 2001. (D.I. 343 at 4.)

provide credit and financial services, primarily to members of the African American community. (D.I. 343 at 3; D.I. 332 at 6.)[5] As Wesley Buford, UTN's Chief Executive Officer, testified, UTN targeted consumers in the "sub-prime" market by issuing "a sub-prime product [that] is usually for people who have bad credit or have filed bankruptcy recently and are looking to start all over." (D.I. 343 at 3; D.I. 332 at 5.) According to Chase, this means that UTN focused on the low end of the credit quality spectrum, especially consumers with FICO[6] scores under 580, and that the majority of FREEDOM CARD credit card holders have credit lines of $300. (D.I. 332 at 5–6.) The number of FREEDOM CARD credit card holders peaked at 28,-193 sometime between April 2001 and December 2001. (D.I. 343 at 4.) Chase also says, and UTN does not dispute, that, on average, FREEDOM CARD credit card holders were charged annual fees and interest that cost the card holder approximately 140% over and above the borrowed amount. (D.I. 332 at 5–6.) The FREEDOM CARD credit card does not offer any rebates or awards to its card holders. (Id.)

Chase is a provider of financial services, including banking and credit card services. (D.I. 1 ¶ 8.) In January 2003, Chase launched a promotion effort for a new credit card, known as the CHASE FREE-DOM credit card. (Id. ¶ 9; D.I. 343 at 5.) The CHASE FREEDOM credit card is a reissue of the CHASE Shell MasterCard.[7] (Id. ¶ 10.) The CHASE FREEDOM credit card portfolio consists of approximately 1.5 million converted CHASE Shell MasterCard accounts (the "Converted Accounts") and approximately 10,000 accounts acquired after the January 2003 launch of the card under the name "Chase Freedom" (the "New Acquisition Accounts"). (Id.; D.I. 332 at 4.)

In general, the Converted Account holders are between the ages of 46 and 55, have a FICO score of 800 or higher, own their own home, are married, and have an average annual income between $40,000 and $50,000. (D.I. 332 at 5.) Eighty percent of the New Acquisition Account holders own their own home and 60 percent have a FICO score of 780 or higher. (Id.) The majority of CHASE FREEDOM credit card holders have credit lines of $5,000 to $10,000, with no annual fee and an annual percentage rate ("APR") between 12.4% and 14.4%.[8] (Id.)

Mr. Buford contacted Chase on the day the CHASE FREEDOM credit card was launched and objected to Chase's use of CHASE FREEDOM in connection with the credit cards. (D.I. 1 ¶¶ 18, 19; D.I. 332 at 5; D.I. 343 at 6.) UTN informed Chase that, in UTN's opinion, Chase was

---

5. D.I. 332 is Chase's Brief in Support of its Motion and D.I. 343 is UTN's Answering Brief.

6. FICO stands for "Fair Issac Corporation" and is a scoring system which grades consumers on the likelihood of their ability to live up to their credit obligations. The higher the FICO score, the more likely a consumer is to fulfill his credit obligations. (D.I. 332 at 5 n. 2.)

7. In 1993, Shell Oil Company ("Shell") and Chase began marketing a co-branded credit card called the CHASE Shell MasterCard,

which featured a gas rebate program for gasoline purchased at Shell gas stations. (D.I. 332 at 3.) In March 2002, Shell terminated its relationship with Chase. (Id.; D.I. 343 at 5.) Chase wanted to have a different branded card to serve its existing CHASE Shell MasterCard accounts, which prompted the creation of the CHASE FREEDOM credit card at issue in this litigation. (Id. at 3–4; D.I. 343 at 5.)

8. UTN does not dispute the way Chase describes its Converted Account and New Acquisition Account holders.

infringing UTN's registered FREEDOM CARD trademarks and that Chase's actions violated a 1999 Mutual Confidentiality Agreement ("Confidentiality Agreement") between FreedomCard and Chase USA.[9] (*Id.* ¶ 22; D.I. 332 at 5.) After UTN objected to the CHASE FREEDOM credit card, Chase stopped its advertising and marketing efforts for the CHASE FREEDOM credit card. (*Id.*) By May 2003, Chase launched the CHASE PERFECTCARD credit card to replace the CHASE FREEDOM credit card. (D.I. 332 at 8.)

## III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c) (2004). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to

do more than simply show that there is some metaphysical doubt as to the material facts...In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial....Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

Chase advances several arguments in its Motion. First, Chase says that, on the basis of arguments UTN made before the U.S. Patent and Trademark Office ("USPTO"), UTN should be estopped from asserting that its use of CHASE FREEDOM on its credit cards infringes the FREEDOM CARD mark. (D.I. 332 at 9–12.) Second, Chase argues that UTN cannot establish a likelihood of confusion between the two marks.[10] (*Id.* at 12–24.) Third, Chase seeks a declaratory judgment

9. The Confidentiality Agreement stems from a period of communication between UTN and Chase at a time when UTN was approaching numerous banks to discuss a possible affiliation for its FREEDOM CARD credit card. (D.I. 332 at 7.) Discussions between UTN and Chase concluded before the parties reached a deal. (*Id.*)

10. There is some disagreement between the parties as to whether Chase's allegedly infringing mark is "CHASE FREEDOM" or "CHASE FREEDOM card." (*See* D.I. 343 at 12; D.I. 351 at 4.) However, as discussed more fully herein, *infra* at pp. 245–46, the word "card" in this context is descriptive, such that UTN disclaimed exclusive rights to use it as a part of its federal trademark registration for FREEDOM CARD. Therefore, the inclusion or exclusion of the word "card" as part of Chase's allegedly infringing mark does not impact the conclusion reached herein.

that it has not breached the 1999 Confidentiality Agreement.[11] (*Id.* at 24–25.) Finally, Chase says that it is entitled to partial summary judgment on UTN's claims for monetary damages. (*Id.* at 25–35.)

UTN opposes Chase's Motion and argues that Chase has "misconstrued and misapplied" the doctrine of judicial estoppel, and that UTN did not take any position before the USPTO that is inconsistent with the arguments it is asserting in this litigation. (*Id.* at 13–17.) UTN also says that Chase's use of the CHASE FREEDOM mark on its credit cards causes a likelihood of confusion with its federally registered FREEDOM CARD mark. (*Id.* at 20–32.) UTN asserts that it is entitled to monetary damages in this case. (*Id.* at 33–39.) Because the issue of likelihood of confusion is dispositive, the following discussion focuses primarily on that point.

■ "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 (3d Cir.1994) (citing *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983)) (other citations omitted). Under federal law, trademark infringement, 15 U.S.C. § 1114, and unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards.[12] *See A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 202 (3d Cir.1999) ("*A & H III*"). To prove either form of Lanham Act violation, a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.[13] *Id.* In this case, it is undisputed that UTN owns FREEDOM CARD, and that it is a valid and legally protectable mark. (D.I. 343 at 17–20; D.I. 351 at 3.) "Therefore, the questions in this

11. Though Chase raises this argument in its opening brief, UTN failed to address it in its answering brief. In the absence of any evidence showing that there is a genuine issue for trial as to whether Chase breached the 1999 Confidentiality Agreement, summary judgment on this point must be entered for Chase. *See Matsushita Elec.,* 475 U.S. at 586–87, 106 S.Ct. 1348. Therefore, Chase's Motion will be granted in this regard, *i.e.* that it is held not to have breached the 1999 Confidentiality Agreement between the parties.

12. Section 32(1) of the Lanham Act provides:

Any person who shall, without the consent of the registrant-
(A) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;...shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1). The same standard is embodied in section 43(a) of the Lanham Act, which governs unfair competition claims. That section provides, in pertinent part:
Any person who, on or in connection with any goods or services,...uses in commerce any word, term, name, symbol, or device,...or any false designation of origin...which-
(A) is likely to cause confusion, or to cause mistake, or to deceive as to...the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...shall be liable in a civil action by any person who believes that he or she is or is likely to be damages by such act.
15 U.S.C. § 1125(a)(1)(A).

13. The same standards apply to UTN's claims for trademark infringement and unfair competition under Delaware and New York law. *See Rockland Mortgage Corp. v. Shareholders Funding,* 835 F.Supp. 182, 188 (D.Del.1993); *Tri–Star Pictures, Inc. v. Leisure Time Prods. B.V.,* 17 F.3d 38, 43 (2d Cir.1994).

case involve the delineation and application of standards for the evaluation of likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir.2000) ("*A & H V*").

 A likelihood of confusion exists when "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Dranoff–Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir.1992) (quotation marks omitted). Courts in the Third Circuit use the following ten factors, known as the *Lapp* factors, to determine the likelihood of confusion between two trademarks:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time defendant has used the mark without evidence of actual confusion;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of

the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Lapp*, 721 F.2d at 463. The *Lapp* factors are "used both for competing and for non-competing goods."[14] *A & H V*, 237 F.3d 198, 213. However, "[n]ot all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." *Id.* at 215.

### 1. The Degree of Similarity Between the Owner's Mark and the Alleged Infringing Mark

 The "degree of similarity of the marks may be the most important of the ten factors in *Lapp*." *Fisons Horticulture*, 30 F.3d at 476. In determining whether two marks are confusingly similar, courts should focus on the overall impression created by the marks, rather than conducting a side-by-side comparison. *See id.* at 477–78; *A & H V*, 237 F.3d at 216. "However, the general rule that marks should be viewed in their entirety does not undermine the common-sense precept that the more forceful and distinctive aspects of a mark should be given more weight, and the other aspects less weight." *A & H V*, 237 F.3d at 216 (citing *Country Floors, Inc. v. Partnership of Gepner and Ford*, 930 F.2d 1056, 1065 (3d Cir.1991)).

Both UTN's FREEDOM CARD mark and the CHASE FREEDOM mark are

---

**14.** Specifically, factors (7), (9) and (10) "are not apposite for directly competing goods: By definition, the goods are competing, their function is the same, and the senior and junior user are already in each other's markets."

*A & H V*, 237 F.3d 198, 212. In this case, the parties agree that, because their goods compete in the same field, the most relevant *Lapp* factors are (1) through (6) and (8). (D.I. 332 at 12 n. 6; D.I. 343 at 22–23.)

used in connection with credit cards and credit card services. The word "freedom," as it is used in these marks, suggests that consumers may gain more financial latitude than they would without the cards or that they can use these credit cards with fewer financial constraints. Despite this commonality, the marks, when taken as a whole, are sufficiently different to create an overall impression that is not confusingly similar, *A & H V*, 237 F.3d at 217, as is amply demonstrated by UTN's own statements.

The USPTO objected to UTN's trademark application for FREEDOM CARD because the mark was likely to cause confusion with Parker Oil's trademark registration for FUEL FREEDOM CARD, also used in connection with credit cards and credit card services. (D.I. 351 at 6.) In order to overcome the USPTO's objections, UTN entered into a Consent Agreement with Parker Oil. (*Id.*) In the Consent Agreement, which was later submitted to the USPTO, UTN acknowledged that there was no likelihood of confusion between the FREEDOM CARD and FUEL FREEDOM CARD marks because they are dissimilar in appearance, sound, connotation, and commercial impression and because, when the marks are considered in their entireties, they are not likely to be confused with one another. (*Id.*) UTN's arguments were successful, as the USPTO subsequently registered the FREEDOM CARD mark. (D.I. 37 ¶¶ 45, 46.)

In the present case, Chase attached its own, well-known name to the word "Freedom". The "[u]se of a strong, well-known mark as a part of a composite name reduces the likelihood that the remainder of the composite name will create a commercial impression distinct from that mark." *Id.* at 218 (citations omitted); *see also A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 57 F.Supp.2d 155, 168 (E.D.Pa.1999) ("*A & H IV*") (affixing a well-known housemark can help diminish likelihood of confusion). Chase argues that the addition of its CHASE housemark to the FREEDOM mark significantly diminishes any potential likelihood of confusion. (D.I. 332 at 17.) Since UTN previously took the position that the descriptive term "fuel," when used in conjunction with the FREEDOM CARD mark, eliminated concern that the marks FREEDOM CARD and FUEL FREEDOM CARD would be confusingly similar, it cannot now persuasively argue that the CHASE housemark in combination with the FREEDOM CARD mark is confusingly similar.[15] *Cf. Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779–80 (3d Cir.2001) (judicial estoppel invoked when party to be estopped asserts a position that is irreconcilably inconsistent with one he asserted in a prior proceeding). Given that Chase is a well-known provider of financial services, I agree that the inclusion of the CHASE housemark with FREEDOM (or FREEDOM card), in connection with credit cards and credit card services, is enough to lessen any likelihood of confusion between the two marks and render the CHASE FREEDOM and FREEDOM CARD marks dissimilar. *See A & H IV*, 57 F.Supp.2d at 168; *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993) ("When a similar mark is used in

15. Furthermore, while prosecuting other trademark applications for "freedom" marks, UTN argued that "no one has the exclusive right to use the word 'FREEDOM' alone," and it directed the USPTO's attention to numerous other "freedom" marks that were "all existing together in the marketplace" in International Class 36, the same class in which the FREEDOM CARD mark is registered. (D.I. 332 at 11.) International Class 36 encompasses insurance and financial, monetary, and real estate affairs. (*Id.*)

conjunction with a company name, the likelihood of confusion may be lessened.").

Despite the fact that the word "freedom", as used in both marks, conveys a similar message to credit card holders, the addition of the CHASE housemark creates a distinction between the marks. Because, in light of the admissions UTN made to the USPTO, the overall impression of the CHASE FREEDOM and FREEDOM CARD marks cannot fairly be said to be confusingly similar, this factor weighs against a finding of likelihood of confusion.

### 2. The Strength of the Owner's Mark

The strength of a mark is measured by (1) the distinctiveness or conceptual strength of the mark and (2) the commercial strength or marketplace recognition of the mark. *Fisons Horticulture*, 30 F.3d at 478–79. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of "marketplace recognition." *Id.* at 479.

### a. Distinctiveness or Conceptual Strength

█ The inherent strength of a mark is measured by classifying the mark within one of four categories from the strongest to the weakest: (1) arbitrary or fanciful (such as KODAK); (2) suggestive (such as COPPERTONE); (3) descriptive (such as SECURITY CENTER); and (4) generic (such as DIET CHOCOLATE FUDGE SODA). *See A & H V*, 237 F.3d at 221 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). The primary purpose of this classification system is to determine whether a mark is entitled to trademark protection in the first place. Even though a mark is suggestive or descriptive, and thus weaker than arbitrary mark, it may still be worthy of protection, particularly if it is used in connection with a number of different products. *Id.* at 222 (citations omitted).

Chase argues that UTN's FREEDOM CARD mark is not inherently strong. First, Chase points out, and UTN cannot dispute, that UTN disclaims the exclusive right to use the word "card" in its trademark registrations because it is descriptive of the goods and services offered under the FREEDOM CARD mark. (D.I. 332 at 14 (citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir.1986)) (descriptive terms convey "an immediate idea of the ingredients, qualities or characteristics of the goods").) Second, Chase argues that the word "freedom" is not inherently strong, particularly given Mr. Buford's deposition testimony that the term "freedom" was chosen to describe the freedom to enjoy access to credit provided by the FREEDOM CARD credit card to consumers in the sub-prime market. (D.I. 332 at 14.) UTN does not respond to these arguments, except to say that the Freedom Card mark "is so unique that the USPTO granted two trademark registrations...." (D.I. 343 at 25.) That argument is less than cogent in light of UTN's acknowledgment before the USPTO that "no one has the exclusive right to use the word 'FREEDOM' alone [.]" (D.I. 322 at 11.)

While it may be true that the words "freedom" and "card," when considered separately, are not themselves inherently strong, the CHASE FREEDOM and FREEDOM CARD marks must be considered as a whole. *See Fisons Horticulture*, 30 F.3d at 476. As previously noted, these marks, when used in connection with credit cards and credit card services, suggest that consumers may gain some financial freedom through the card, including perhaps freedom from the usual constraints imposed upon them by credit card companies. *See supra* at p. 245. In particular, as Mr. Buford testified, the FREEDOM

CARD mark implies that consumers, especially those in the subprime market who had difficultly obtaining credit in the past, would be free to enjoy the benefits of credit. Based on the foregoing, I conclude that the FREEDOM CARD mark is at most suggestive of the goods and services in conjunction with which it is used. However, just because the FREEDOM CARD mark may be viewed as suggestive does not mean that it is a "strong" mark. *See A & H V*, 237 F.3d at 221 (citation omitted). As discussed *supra* at n. 15, UTN presented evidence of widespread third-party use of "freedom" marks in the financial field to the USPTO, which demonstrates that "freedom" marks are common, and therefore, weak. *See A & H V*, 237 F.3d at 221 (". . . [C]ommon marks like 'Arrow,' though certainly not particularly descriptive of the underlying product, have been held to be 'weak' marks.") (citation omitted).[16] Thus, though arguably suggestive, the FREEDOM CARD mark is weak as it is used in connection with credit card and credit card services. *Id.*

### b. Commercial Strength of the Mark

UTN has not come forward with any evidence of the commercial strength of the FREEDOM CARD mark, *i.e.*, the amount of money that it spent on advertising, whether it took any steps to increase public recognition of the FREEDOM CARD mark, and whether the public does, in fact, recognize the FREEDOM CARD mark. *See A & H V*, 237 F.3d at 224. In fact the evidence strongly indicates that there is no commercial strength to UTN's mark. At its peak, UTN had 28,193 cardholders. That was three years ago. UTN only issued cards for one year. Given these facts, it is hardly surprising that UTN has

chosen to offer no evidence at all of commercial strength. There is none, and this factor weighs against a finding of likelihood of confusion.

### 3. *The Price of the Goods and Other Factors Indicative of the Care and Attention Expected of Consumers When Making a Purchase*

When goods and services are relatively expensive, consumers exercise more care when purchasing them and are less likely to be confused as to the source or affiliation of the goods and services. *See Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 204 (3d Cir.1995) ("The more important the use of the product, the more care that must be exercised in its selection.") Generally, consumers exercise a high degree of care in choosing banking services. *First Nat'l Bank in Sioux Falls v. First Nat'l Bank South Dakota*, 153 F.3d 885, 888–89 (8th Cir.1998). As a result, "customers are more likely to notice what, in other contexts, may be relatively minor differences in names." *Id.* at 889.

Chase relies upon the opinion of its expert witness, Pierce Sioussat, to support its argument that consumers "look to a number of factors when considering whether to apply for an carry a credit card, such as the interest rate, rewards offered, affinity relationship, and introductory offers." (D.I. 332 at 19.) According to Chase, "consumers exercise heightened care in evaluating the relevant product before making a purchasing decision." (*Id.*) In response, UTN calls Mr. Sioussat's opinion "absurd and unsupportable" and makes the bare assertion that, while consumers "pay close attention in choosing their bank," they do not necessarily exer-

---

**16.** UTN freely admitted to the USPTO that FREEDOM was a "commonly and frequently used term. . . ." (D.I. 351 at 8.)

cise the same care when choosing a particular credit card.[17] (D.I. 343 at 27.)

Even accepting UTN's assertion as true, namely that people are more sensitive in choosing a bank than a credit card, that does not mean they are casual in choosing a credit card. UTN offers no evidence to rebut the evidence offered by Chase that consumers do exercise considerable care in selecting who will carry their debt. This factor therefore also weighs against a finding of likelihood of confusion.

4. *The Length of Time Defendant Has Used the Mark Without Evidence of Actual Confusion and the Evidence of Actual Confusion*

Because these fourth and sixth *Lapp* factors require me to consider evidence of actual confusion, I consider them together. The "most relevant evidence of actual confusion is the testimony of a reasonably

prudent purchaser who was in fact confused by defendant's trademark." *See Checkpoint Sys. Inc. v. Check Point Software Techs., Inc.*, 104 F.Supp.2d 427, 464 (D.N.J.2000) (internal quotations omitted), *aff'd*, 269 F.3d 270 (3d Cir.2001). Chase says that UTN has "absolutely no evidence of actual confusion." (D.I. 332 at 19.) UTN says that its Certified Public Accountant, Richard Moon, believed that the CHASE FREEDOM credit card was a joint venture between FreedomCard and Chase. (*Id.* at 28.) UTN bases that assertion on statements made by Mr. Buford during his deposition, and not on any firsthand account from Mr. Moon himself. (*Id.*) UTN also claims that many consumers telephoned UTN's offices inquiring about the Chase Freedom Card, but it has no independent evidence to support this claim. (*Id.*) Quite simply, UTN has not come forward with any competent evidence of actual confusion.[18] Thus, this factor

---

**17.** UTN filed a Motion to Exclude the Expert Report and Testimony of Pierre S. Sioussat on May 3, 2004. (D.I.326.) Mr. Sioussat was retained by Chase to provide expert testimony about the credit card industry in general, the CHASE FREEDOM credit card, and UTN's FREEDOM CARD credit card. (D.I. 327, Ex. A at 2.) Mr. Sioussat devotes the majority of his expert report to comparing and contrasting the marketing channels for and the particular characteristics of the CHASE FREEDOM credit card and the FREEDOM CARD credit card. (*See id.*, Ex. A at 21–27.) UTN objects to Mr. Sioussat's expert report and testimony to the extent that he offers his opinion about the validity or infringement of the FREEDOM CARD mark. (*Id.* at 11.) While it is true that Mr. Sioussat's opinions overlap with some of the factors used to determine likelihood of confusion (i.e., price of goods and services, whether the goods and services are targeted at similar consumers), Mr. Sioussat offers these opinions in his capacity as an expert on the credit card industry, not as an expert on trademark law. (*See id.*, Ex. A at 2; D.I. 341 at 17.) Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), I must determine whether Mr. Sioussat's proffered testimony meets the "triology of restrictions on expert

testimony: qualification, reliability, and fit," *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir.2003). In this case, Mr. Sioussat states that he has fifteen years of experience in the credit card industry and, for the past three years, has managed many "large-scale consulting projects in the areas of product management, alliance development (i.e. co-branding), and portfolio sale transactions" for the Auriemma Consulting Group, Inc., "a firm dedicated almost exclusively to the credit card industry." (D.I. 327, Ex. A at 3.) UTN does not challenge Mr. Sioussat's experience and he appears to be qualified to testify as an expert regarding the credit card industry. *See Calhoun*, 350 F.3d at 321 (expert qualifications are satisfied by a "broad range of knowledge, skills and training"). Mr. Sioussat's report and testimony are also reliable, as they are based upon his specialized knowledge in the credit card industry. *Id.* Finally, Mr. Sioussat's testimony is relevant for the proposition that people choose credit cards with care. *Id.* Therefore, UTN's Motion to Exclude Mr. Sioussat's expert report and testimony will be denied.

**18.** Even accepting as true that Mr. Moon was confused, such *de minimis* evidence of actual

also weighs significantly against a finding of likelihood of confusion.

### 5. The Intent of the Defendant in Adopting the Mark

"[A] defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *A & H V*, 237 F.3d at 225–26 (citation omitted). Chase argues that UTN has no evidence to establish that Chase intended to confuse consumers by purposefully trading on the goodwill in UTN's Freedom Card mark. (D.I. 332 at 21.) Indeed, it is undisputed that Chase created the CHASE FREE-DOM mark by hiring outside consultants, conducting qualitative research on focus groups, and forming a team from its internal staff to facilitate the development of a new credit card product. (*See* D.I. 332 at 22; D.I. 343 at 5.) On the basis of that research, Chase adopted the CHASE FREEDOM credit card to replace the CHASE Shell MasterCard. (*Id.*)

UTN responds obliquely by arguing that there is "palpable derision" in Chase's assertion that UTN's FREEDOM CARD was targeted to consumers with poor credit or no credit. (D.I. 343 at 30.) From that, UTN says, I should infer that "Chase willfully infringed [UTN's] mark, feeling the time, money and effort invested was not to be wasted" in creating its own mark. (*Id.*) That invitation seems to be rooted in and pitched at emotions rather than being rooted in evidence and directed at reason. UTN has not set forth any competent evidence to prove that Chase adopted the CHASE FREEDOM mark with the intent

confusion does not establish a genuine issue of material fact on the likelihood of confusion issue and is insufficient to prevent dismissal on summary judgment. *See Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527,

to confuse consumers. This factor weighs against a finding of likelihood of confusion.

### 6. The Extent to Which the Targets of the Parties' Sales Efforts Are the Same

Even though the CHASE FREEDOM credit card and the FREEDOM CARD are both used in connection with credit cards and credit card services, the undisputed evidence in this case indicates that they are targeted at different groups of consumers. Chase's CHASE FREEDOM credit card is targeted to consumers with FICO scores averaging around 780, while UTN's FREEDOM CARD credit card it targeted to consumers with poorer credit, typically with FICO scores below 580, placing them in the sub-prime lending range. (*Id.* at 23.) Mr. Buford, UTN's CEO, made the distinction by saying, "Chase is targeting the high-income level and FreedomCard is targeting the middle-to-low income level." (D.I. 332 at 23.)

UTN started the FREEDOM CARD credit card "seeking to extend credit primarily to the African–American community." (D.I. 343 at 3.) Chase did not target any specific group of consumers, as UTN did. Chase also approached marketing differently, advertising the CHASE FREEDOM credit card in print advertising, while UTN advertised on television, for the brief time it advertised at all. (D.I. 332 at 23.) Because it is undisputed that the parties' goods and services were targeted to different groups of consumers and advertised in different channels, this factor also weighs against a finding of likelihood of confusion.

1535 (10th Cir.1994) (employee affidavits, testimony, and survey results offered as evidence of actual confusion considered *de minimis* because they were isolated instances of actual confusion and very limited in scope).

## V. CONCLUSION

All of the relevant *Lapp* factors considered above weigh against a finding of likelihood of confusion. Because I find that there is no likelihood of confusion between Chase's CHASE FREEDOM mark and UTN's FREEDOM CARD mark, Chase's Motion (D.I.329) will be granted to the extent that judgment will be entered for Chase on UTN's claims of federal and common law trademark infringement and unfair competition. Chase's Motion will also be granted to the extent that it seeks a declaratory judgment that it did not breach the 1999 Confidentiality Agreement. In all other respects,[19] Chase's Motion will be denied as moot. Chase's Motion to Exclude the Expert Testimony of Michael F. Maloney (D.I.330) and UTN's Motion to Consolidate and Realign the Parties for a Jury Trial on the Trademark Infringement Claim and to Strike an Expert Opinion as Untimely (D.I.323) will be denied as moot. UTN's Motion to Exclude the Expert Report of Pierce Sioussat (D.I. 326) will be denied.[20] An appropriate order will follow.

### *ORDER*

In accordance with the Memorandum Opinion issued today, it is hereby ORDERED that the Third Party Defendants' Motion (D.I.329) is GRANTED to the extent that summary judgment is granted for the Third Party Defendants on the Defendants'/Third Party Plaintiffs' claims of federal and common law trademark infringement and unfair competition. The Third Party Defendants' Motion is also GRANTED to the extent that it seeks a declaratory judgment that they did not breach the 1999 Confidentiality Agreement. In all other respects, the Third Party Defendants' Motion is DENIED as moot. The Third Party Defendants' Motion to Exclude the Expert Testimony of Michael F. Maloney (D.I.330) and the Defendants'/Third Party Plaintiffs' Motion to Consolidate and Realign the Parties for a Jury Trial on the Trademark Infringement Claim and to Strike an Expert Opinion as Untimely (D.I.323) are DENIED as moot. The Defendants'/Third Party Plaintiffs' s Motion to Exclude the Expert Report of Pierce Sioussat (D.I.326) is DENIED.

---

**19.** Chase's Motion will be denied as moot with respect to its motion for summary judgment on the basis of judicial estoppel. (D.I. 332 at 9.) While I have relied on UTN's statements before the USPTO in reaching my decision, I do not believe it is necessary to answer the question of whether UTN is estopped from advancing a contrary position. Chase's motion for partial summary judgment on UTN's claims for monetary damages (*id.* at 25) will also be denied as moot.

**20.** *See supra* n. 16.