

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-22-2005

# Freedom Card Inc v. JP Morgan Chase & Co

Precedential or Non-Precedential: Precedential

Docket No. 04-3874

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Freedom Card Inc v. JP Morgan Chase & Co" (2005). *2005 Decisions.* Paper 11.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/11

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 04-3874

*FREEDOM CARD, INC.;
URBAN TELEVISION NETWORK, INC.,

Appellants

v.

JPMORGAN CHASE & CO.;
CHASE MANHATTAN BANK USA, N.A.

(Dist. Of DE No. 03-cv-00432)


CHASE MANHATTAN BANK USA, N.A.

v.

URBAN TELEVISION NETWORK, INC.;
FREEDOM CARD, INC.,
Appellants

v.

JPMORGAN CHASE BANK;
JPMORGAN CHASE & CO.,

Third Party Defendants

(Dist. Of DE No. 03-cv-00217)

*(Amended Per Clerk's Order Dated 12/2/04)

No: 04-3876

*FREEDOM CARD, INC.;
URBAN TELEVISION NETWORK, INC.,

Appellants

v.

JPMORGAN CHASE & CO.;
CHASE MANHATTAN BANK USA, N.A.

(Dist. Of DE No. 03-cv-00432)

CHASE MANHATTAN BANK USA, N.A.

v.

URBAN TELEVISION NETWORK, INC.;
FREEDOM CARD, INC.,
Appellants

v.

2

JPMORGAN CHASE BANK;
JPMORGAN CHASE & CO.,

Third Party Defendants

(Dist. Of DE No. 03-cv-00217)

*(Amended Per Clerk's Order Dated 12/2/04)

No:  04-4285

*FREEDOM CARD, INC.;
URBAN TELEVISION NETWORK, INC.,

Appellants

v.

JPMORGAN CHASE & CO.;
CHASE MANHATTAN BANK USA, N.A.

(Dist. Of DE No. 03-cv-00432)

CHASE MANHATTAN BANK USA, N.A.

v.

URBAN TELEVISION NETWORK, INC.;
FREEDOM CARD, INC.,
Appellants

3

v.

JPMORGAN CHASE BANK;
JPMORGAN CHASE & CO.,

Third Party Defendants

(Dist. Of DE No. 03-cv-00217)

*(Amended Per Clerk's Order Dated 12/2/04)

Appeal from the United States District Court
for the District of Delaware
District Judge: Hon. Kent A. Jordan

Argued: September 15, 2005

Before: ROTH, McKEE and FISHER,
Circuit Judges

(Opinion filed: December 22, 2005)

DANA M. CAMPBELL, ESQ.  (Argued)
Owens, Clary & Aiken, L.L.P.
700 North Pearl Street, Suite 1600
Dallas, Texas 75201
Attorneys for Appellants


ETHAN HORWITZ, ESQ.  (Argued)
LEONARD F. LESSER, ESQ.

KANDIS M. KOUSTENIS, ESQ.
Goodwin Procter LLP
599 Lexington Avenue
New York, New York 10022

RICHARD D. ALLEN, ESQ.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

<u>Attorneys for Appellees</u>

OPINION

McKEE, <u>Circuit Judge</u>.

Urban Television Network, Inc ("UTN")[1] appeals from the district court's grant of summary judgment on the "reverse confusion" trademark infringement and unfair competition

---

[1]UTN" refers to Urban Television Network, Inc., and Freedom Card, Inc., both of which are Delaware corporations with their principal place of business in California. UTN owns U.S. Trademark Registration Nos. 2,398,191 and 2,398,192 for "FREEDOM CARD" in International Class 36 for credit card services and in International Class 16 for credit cards, respectively. Freedom Card, Inc., is the exclusive licensee of the FREEDOM CARD marks.

claims UTN brought against Chase.[2] UTN asserted those claims in counterclaims it filed in response to Chase's declaratory judgment action. Chase filed that action to obtain a judicial declaration that its CHASE FREEDOM credit card did not violate any rights UTN had in its FREEDOM CARD trademark.[3] The district court ruled that Chase had not violated UTN's trademark, and this appeal followed. For the reasons that follow, we will affirm.[4]

---

[2]"Chase" refers to JP Morgan Chase Bank and Chase Manhattan Bank, USA, NA, and J.P. Morgan Chase & Co. JP Morgan Chase Bank and Chase Manhattan Bank, USA, NA, are wholly owned subsidiaries of J.P. Morgan Chase & Co.

[3] In referring to the trademarks at issue in this case, we will use all upper case letters as the district court did. The district court also noted that "[t]here is some disagreement between [UTN and Chase] as to whether Chase's allegedly infringing mark is 'CHASE FREEDOM' or 'CHASE FREEDOM card.'" However, the court concluded that "the word 'card' in this context is descriptive. . . . Therefore, the inclusion or exclusion of the word 'card' as part of Chase's allegedly infringing mark does not impact the conclusion reached herein." *Chase Manhattan Bank*, *U.S.A. v. Freedom Card, Inc.*, 333 F. Supp. 2d 239, 244 n.10 (D. Del. 2004). We agree. Moreover, UTN does not suggest the district court erred in analyzing its claim in that context.

[4] Although UTN filed notices of appeal from each of the district court's original and clarifying orders, UTN's appellate

# I. BACKGROUND

In December 2000, UTN began offering its FREEDOM CARD in conjunction with CompuCredit Corporation. The FREEDOM CARD was offered to extend credit and financial services to the "sub-prime" credit market that is disproportionately comprised of African-American consumers. UTN focused its promotional efforts on "people who [had] bad credit or [had] filed bankruptcy recently and [were] looking to start all over." *Chase Manhattan Bank, USA v. Freedom Card, Inc.* 333 F. Supp. 2d 239, 242 (D. Del. 2004). UTN entered into a contract with Queen Latifah, a prominent African American entertainer, as part of its efforts to promote the FREEDOM CARD. The majority of FREEDOM CARD customers had credit lines of $300. On average, they were charged annual fees and interest amounting to 140% over and above their principal balance. *Id.*[5] CompuCredit stopped marketing and issuing new accounts for the FREEDOM CARD card after December 2001. *Id.* at 242 n.4. The district court found, FREEDOM

---

arguments are limited to the district court's grant of summary judgment to Chase. We have plenary review of the district court's grant of summary judgment. *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315 (3d Cir. 1999).

[5]The exceedingly high rate of interest and fees meant that the average cardholder who charged a $100 coat on his/her FREEDOM CARD would pay a total of $240, $100 for the coat and another $140 in interest and fees.

CARD peaked at 28,193 accounts.

For a number of years, Chase and Shell Oil Company had issued a co-branded credit card called "CHASE Shell MasterCard." The card offered cash rewards on purchases of Shell gasoline. In March 2002, Shell notified Chase that it was terminating their relationship. Chase owned the Shell accounts and in order to retain those accounts it began developing a new credit card product that would serve existing accounts as well as generate new ones.

Chase's research eventually lead to a rewards program that allowed Chase's customers to use its card at any gasoline company's filling station and receive rebates on gasoline as well as other purchases. Chase claims that it named the card "CHASE FREEDOM card," because of the freedom it afforded cardholders to purchase gasoline wherever the cardholder chose. On January 11, 2003, Chase sent a letter to its Shell account holders notifying them that their Shell cards would be automatically converted to CHASE FREEDOM cards.

The CHASE FREEDOM card was officially announced in a January 27, 2003, advertisement in the *Wall Street Journal*, more than a year after the FREEDOM CARD card stopped being issued. "The CHASE FREEDOM card [was] a reissue of the CHASE Shell MasterCard." *Chase*, 333 F. Supp. 2d at 242. The CHASE FREEDOM portfolio consisted of approximately 1.5 million converted Shell accounts and fewer than 10,000 accounts acquired after the January 27, 2003 launch.

Chase maintains that the converted account holders were

generally between the ages of 46 and 55, had a FICO[6] score of 800 or higher, owned their own homes, and were married with average annual incomes between $40,000 and $50,000. Of the acquired account holders, 80% owned their own home and 60% had a FICO score of 780 or higher. Chase claims that the majority of CHASE FREEDOM cardholders had credit lines of $5,000 – $10,000, with no annual fee and an annual percentage rate of between 12.4% and 14.4%. *Id*.

The *Wall Street Journal* advertisement for CHASE FREEDOM card was the only advertisement that ever appeared. Upon seeing the *Wall Street Journal* advertisement the day it first appeared, Wesley Buford, UTN's Chief Executive Officer, contacted Chase and complained that Chase was infringing UTN's FREEDOM CARD mark. *See* n.1, *supra*.[7] After

_____

[6]FICO refers to the Fair Isaac Corporation, which is the industry standard credit scoring system. FICO scores are based on a consumer's credit history. "The higher the FICO score, the more likely a consumer is to fulfill his credit obligations. *Chase*, 333 F. Supp. 2d at 242 n.6,

[7]Although Buford describes FREEDOM CARD's market as "sub-prime;" Chase alleges that FREEDOM CARD's customer base was actually "sub-sub-prime" as it consisted of the lowest end of the credit spectrum. According to Chase, prime customers usually have credit scores above 660 and sub-prime customers score below 660. However, Chase claims without contradiction that FREEDOM CARD focused on customers with credit scores below 580, well below the federal guidelines

9

Buford objected, Chase immediately halted its advertising and marketing efforts for "CHASE FREEDOM," and refrained from acquiring any new customers.[8]

Thereafter, representatives of Chase and UTN met to discuss the problem. Chase claims that discussions broke down after UTN threatened to "have people protesting around [Chase's] branches" and to have demonstrations calling attention to "the evils of Chase and this Freedom Mastercard [sic]" and thereby "cause [Chase] a great deal of harm." Appellees' Br. at 6. UTN claims that these meetings were "positive and friendly" rather than confrontational and, based upon prior positive communication between the parties and Chase's prompt cessation of CHASE FREEDOM card, Buford still believed that the matter could be resolved amicably. Appellants' Br. at 12. As a consequence of that belief, UTN claims that it maintained its relationship with Queen Latifah and even executed another commercial production agreement with

for sub-prime lending. *Chase*, 333 F. Supp. 2d at 242.

[8] The only other reference to the CHASE FREEDOM card that appeared was a one-paragraph news article in *Newsweek* magazine, entitled "Pump Up A Rebate." Chase states that it neither initiated nor promoted that article. However, UTN claims that Chase booked 9,709 new accounts from January 27, 2003 through May 18, 2003, as a result of the *Newsweek* article.

her on February 19, 2003.

## II. DISTRICT COURT PROCEEDINGS

On February 4, 2003, Chase filed the instant action in district court seeking a declaration that its use of the CHASE FREEDOM mark did not infringe any of UTN's rights in the FREEDOM CARD mark. UTN counterclaimed asserting third-party claims for trademark infringement in violation of 15 U.S.C. § 1114,[9] and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).[10] UTN also sought a determination

---

[9] Section 32(1) of the Lanham Act, covering trademark infringement, 15 U.S.C. § 1114(1) provides:

> Any person who shall, without the consent of the registrant –
> (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising or any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant. . . .

[10] Section 43(a) of the Lanham Act, covering unfair competition, 15 U.S.C. § 1125(a)(1)(A), provides, in relevant part:

that Chase was in violation of a 1999 Mutual Confidentiality Agreement between Chase and UTN.[11]

At the close of discovery, Chase filed several motions including a motion for summary judgment on UTN's trademark infringement and unfair competition claims. The district court granted Chase's motion for summary judgment upon determining that there was no likelihood of confusion between "CHASE FREEDOM" and FREEDOM CARD. *See Chase Manhattan Bank, supra.* Thereafter, the district court issued

> Any person who, in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, . . . or any false designation of origin, which –
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

[11]The Confidentiality Agreement stems from communications between UTN and Chase when UTN was approaching numerous banks to explore possible affiliations for the FREEDOM CARD that it subsequently issued in conjunction with CompuCredit. The discussions between UTN and Chase ended without any agreement regarding the card.

another order clarifying that the prior order had disposed of all claims and that the judgment against UTN was therefore final. This appeal followed.[12]

## III. HISTORICAL CONTEXT.

As noted above, *see* n.1, *supra*, UTN relies upon two registrations of its FREEDOM CARD mark – Nos. 2,398,191 and 2,398,192. The United States Patent and Trademark Office ("USPTO") initially rejected UTN's applications for those marks because it was concerned about the likelihood of confusion with a prior registration of Parker Oil Company for the mark "Fuel Freedom Card." Parker also used that mark on a credit card. In order to overcome those concerns, UTN entered into a Consent Agreement with Parker Oil, and submitted that agreement to the USPTO. In the Agreement, UTN admitted there was no likelihood of confusion between "FREEDOM CARD" and "Fuel Freedom Card" because the marks "are dissimilar in appearance . . . dissimilar in sound . . . dissimilar in connotation . . . dissimilar in commercial impression" and "when considered in their entireties are not likely to be confused" with one another. The USPTO accepted the Consent Agreement and granted the registrations to UTN. *Chase*, 333 F. Supp. 2d at 246.

---

[12] UTN has also filed a separate trademark infringement and unfair competition complaint against Chase in district court in New York. That action was enjoined and later transferred to the District Court for the District of Delaware.

13

UTN also submitted a one-inch thick exhibit of numerous other "freedom" marks in response to concerns the USPTO had with additional "freedom mark" registrations that UTN applied for. UTN argued that these marks, together with third-party marks cited by the USPTO, were "all existing together in the marketplace" and UTN therefore argued that "no one has the exclusive right to use the word 'FREEDOM' alone." *Id.* at 246, n.15. In response to concerns that UTN's FREEDOM CARD would be confused with Parkers "Fuel Freedom Card," UTN also represented to the USPTO that, because of such frequent third-party use, the addition of the descriptive term "fuel" "when used in conjunction with the FREEDOM CARD mark, eliminated concern that the marks FREEDOM CARD and FUEL FREEDOM CARD would be confusingly similar." *Id.* at 246.

Chase also provided the district court with substantial direct evidence of widespread, third-party use of the term "freedom." According to this undisputed evidence, there are approximately 20 MasterCard and VISA "freedom" credit cards and roughly 50 MasterCard and VISA "freedom" debit and ATM cards. There are also about 25 banks using "freedom" as part of their name or in connection with a banking product, as well as about 200 other financial companies that use "freedom" as part of their name.

UTN claims that CompuCredit approached it in October 2002, with an offer for the rights to the FREEDOM CARD name, and that CompuCredit's offer was then valued at $15 million. UTN maintains that the parties were close to resolving a few remaining issues and expected to execute the agreements

at the end of January 2003. However, according to UTN, the negotiations between it and CompuCredit were interrupted by the introduction of the CHASE FREEDOM card on January 27, 2003. UTN contends that after the introduction of the CHASE FREEDOM card, CompuCredit believed that consumer confusion would depress the value of the FREEDOM CARD mark. Therefore, CompuCredit allegedly refused to proceed with UTN because it did not have the resources to compete with Chase. Thus, in UTN's view, given the strength of the "CHASE" mark, and Chase's resources, the introduction of the CHASE FREEDOM card effectively stifled any effort to close the transaction with CompuCredit or to market UTN's product with any other institution that had expressed interest.[13]

According to UTN, Chase converted 1,506,070 Shell

---

[13] In disputing that the CHASE FREEDOM card destroyed UTN's opportunity to consummate the deal with CompuCredit, Chase relies upon deposition testimony from Dennis James of CompuCredit. He testified that after Chase's *Wall Street Journal* advertisement for CHASE FREEDOM, CompuCredit was still prepared to close the transaction on the same basis as before. Chase contends that UTN admitted that the real reason that the CompuCredit deal did not go forward was because UTN wanted too much money from CompuCredit. Buford testified that UTN turned down CompuCredit's offer because UTN wanted an additional $5 million, and Chase correctly argues that UTN cannot so easily distance itself from Buford's deposition despite its rather intense efforts to do so. *See* Fed. R. Civ. P. 30(b)(6).

accounts to their new CHASE FREEDOM card. In addition, UTN claims that, although Chase launched a new CHASE PERFECTCARD in May 2003, purportedly to replace the Freedom card, Chase did not remove existing CHASE FREEDOM cards from the market.

## IV. GENERAL PRINCIPLES.

"The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.'" *Kos Pharmaceuticals, Inc., v. Andrx Corp.,* 369 F. 3d. 700, 711 (3d Cir., 2004) (quoting 15 U.S.C. § 1114(1)). Thus, "[t]he law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) (citations omitted). Although *Fisons Horticulture* involved trademarks, not . . . unfair competition, [as UTN alleges as part of its counterclaim here,] the analysis is the same. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 202 (3d Cir. 1999) ("*A&H III*"). "To prove either form of Lanham Act violation, a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services."[14] *Id.* Because

---

[14] Of course, the plaintiff bears the burden of proof. *See American Home Prods. Corp. v. Barr Labs, Inc.*, 834 F.2d 368, 371 (3d Cir. 1987). UTN was the named defendant in Chase's

it is undisputed that UTN owns FREEDOM CARD, a valid and legally protectable mark, "the questions in this case involve the delineation and application of standards for the evaluation of likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) ("*A&H V*").

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Id.* (citation and internal quotations omitted). The relevant inquiry is not whether consumer confusion is a possibility, but whether confusion is likely. *A&H V*, 237 F.3d at 198. Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief. *Interpace Corp. v. Lapp, Inc.* 721 F.2d 460, 462 (3d Cir. 1983) (citing 15 U.S.C. § 1114(1)).

There are two types of "likelihood of confusion" claims – "direct confusion" claims and "reverse confusion" claims. As we noted at the outset, we are primarily concerned with a claim of reverse confusion because that is how UTN argues this appeal. Although direct confusion and reverse confusion have developed as two separate doctrines, they are not as analytically distinct as may, at first blush, appear. "Isolated instances of

declaratory action. However, because UTN filed counterclaims and third-party claims against Chase for trademark infringement and unfair competition, UTN is treated as the plaintiff in this appeal of the district court's dismissal of those claims.

17

direct confusion may occur in a reverse confusion case, and vice-versa." *Checkpoint Systems, Inc., v. Check Point Software,* 269 F.3d 270, 305 (3d Cir. 2001) (citation omitted). Accordingly, although we are resolving UTN's claim of reverse confusion, we can not ignore the doctrine of direct confusion.

## A. Direct Confusion

The essence of a direct confusion claim is that a junior user of a mark attempts to free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark. *A&H V,* 237 F.3d at 228; *see also Fisons Horticulture*, 30 F.3d at 474 (In a direct confusion claim, "the new or junior user of the mark will use to its advantage the reputation and goodwill of the senior user by adopting a similar or identical mark."); *Checkpoint Systems,* 269 F.3d at 301. Thus, "the consuming public may assume that the established, senior user is the source of the junior user's goods." *Id.*

In deciding whether similar marks create a likelihood of confusion, we have adopted a non-exhaustive test using 10 factors that have come to be known as the *"Lapp* factors,"[15] for determining the likelihood of confusion between two marks where direct confusion is alleged. Pursuant to that analysis, we examine:

---

[15]The factors are named for the case in which they were developed, *viz., Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983).

18

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) (citation omitted). The *Lapp* factors were originally used to determine likelihood of confusion for non-competing goods. *Id.* at 462. Where goods that were the subject of a trademark infringement action directly competed with each other, we originally held that a "court need rarely look beyond the mark itself" to determine likelihood of confusion. *Id*. However, we

19

have since held that the *Lapp* factors should be used for both competing and non-competing goods. *A&H V,* 237 F.3d at 213. In either event, "the *Lapp* test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." *Id.* at 215.[16]

## B. Reverse Confusion

We first recognized Lanhan Act Section 43(a) reverse confusion claims in *Fisons Horticulture.* "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons Horticulture*, 30 F.3d at 474. Thus, the "junior" user is junior in time but senior in market dominance or size.

> In reverse confusion, the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the

---

[16]We have instructed that, if a district court decides that certain of the *Lapp* factors do not advance its analysis, it should explain the reason for not using those factors in order to facilitate our review. *A&H V*, 237 F.3d at 215 n.8.

senior user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

Without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks. The logical consequence of failing to recognize reverse confusion would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor. If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop a new meaning for the trademark as identification of the second user's products.

*Fison Horticulture*, at 474-75 (citations and internal brackets omitted).[17]

---

[17]Although we have recognized reverse confusion claims, we have, nonetheless, noted the problems inherent in such claims.

The chief danger inherent in recognizing reverse confusion claims is that innovative junior users, who have invested heavily in promoting a

Thus, "the doctrine of reverse confusion is designed to prevent . . . a larger, more powerful company usurping the business identity of a smaller senior user." *Commerce National Ins., v. Commerce Insurance Agency, Inc.,* 214 F.3d 432, 445 (3d Cir. 2000).

As noted above, UTN presents its Lanham Act Section 43(a) unfair competition claim as a reverse confusion claim. In *A&H V*, we held that in a typical case alleging reverse confusion, as in a case of direct confusion, a court should apply the *Lapp* factors in assessing likelihood of confusion. 237 F.3d at 208. However, economic reality and common sense require that some of the *Lapp* factors be analyzed differently when reverse discrimination is at issue. *Id.* at 236. Thus, the strength of the parties' marks (*Lapp* factor (2)), the intent in adopting the marks (factor (5)), and the evidence of actual confusion (factor (6)), are analyzed differently from the method employed in a typical direct confusion case.[18]   *id.* at 236.   With these

---

> particular mark, will suddenly find their use of the mark blocked by plaintiffs who have not invested in, or promoted, their own marks. Further, an overly-vigorous use of the doctrine of reverse confusion could potentially inhibit larger companies with established marks from expanding their product lines.

*A&H V,* 237 F.3d at 228 (citations omitted).

[18]Application of *Lapp* factors (3), (7), (8) and (9) is typically the same in both direct confusion and reverse confusion cases.

22

parameters in mind, we turn to the instant dispute.

**(I).  Strength of the mark.**

In evaluating the strength of the mark under *Lapp*, we examine: (1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition). *A&H V*, 237 F.3d at 221.  The inquiry into distinctiveness or conceptual strength is the same whether plaintiff is alleging direct or reverse confusion. *Id*. at 231-32 ("When it comes to conceptual strength . . . we believe that, just as in direct confusion cases, a strong mark should weigh in favor of a senior user.").  The conceptual strength of a mark is measured by classifying the mark in one of four categories ranging from the strongest to the weakest: "(1) arbitrary or fanciful (such as "KODAK"); (2) suggestive (such as "COPPERTONE"); (3) descriptive (such as "SECURITY CENTER"); and (4) generic (such as "DIET CHOCOLATE FUDGE SODA")." *Id.* at 221.  Stronger marks receive greater protection. *Id.* at 222.

In examining a mark's commercial strength, we examine marketplace recognition*. Id.* at 221.  "[I]n a reverse confusion claim, a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as

---

*A&H V*, 237 F.3d at 236.  In addition, absent the presence of housemarks and disclaimers, the similarity of the marks (factor (1)) should generally be examined in a similar fashion in both direct and reverse confusion cases. *Id.*

23

compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." *Id*. at 231. Our focus in resolving reverse confusion should be the commercial impact of the stronger junior user's mark on the weaker mark of the senior but less dominant user.

### (ii). Intent in Adopting the Mark.

In a direct confusion case, the defendant's intent to confuse or deceive consumers can be very probative of the likelihood of confusion. *Id.* at 232. Nevertheless, a defendant's intent to confuse in a reverse confusion case can also be relevant to the likelihood of confusion. *Id.* However, the tenor of the evidence of intent will differ. In a true case of direct confusion, there is an intent to palm-off or ride on the goodwill of the senior user's mark. *Id.* at 225-26. The offender in a reverse confusion case will typically exploit confusion to push the senior user out of the market. *Id*. at 232.

### (iii). Evidence of Actual Confusion.

"[O]ne might assume evidence that the public thought that the senior user was the origin of the junior user's products would support a direct confusion claim while evidence that the public thought that the junior user was the source of the senior user's product would support a reverse confusion claim." *Checkpoint Systems*, 269 F.3d at 305 n.34 (citing *A&H V*, 237 F.3d at 233). However, as noted earlier, because the "manifestation of consumer confusion as 'direct' or 'reverse' may merely be a function of the context in which the consumer

24

first encountered the mark . . . [i]solated instances of 'direct' confusion may occur in a reverse confusion case, and vice-versa." *A&H V*, 237 F.3d at 233. Therefore, there is no strict prohibition against using "direct" confusion evidence in a "reverse" confusion case, or vice-versa. *Id*.

### (iv). Summary of test for reverse confusion.

In *A &H V*, we summarized the test for reverse confusion as follows:

> [I]n the typical case in which there is a claim of reverse confusion, a court should examine the following factors [in determining] whether or not there is a likelihood of confusion:
>
> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;

25

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

237 F.3d at 234.

Here again, "no one factor is dispositive." The weight given each factor can vary with the circumstances of a particular case. *Id*. (citation and internal quotations omitted).

## V. DISCUSSION

UTN's underlying contention before us is that the district court did not properly apply the *Lapp* factors in the context of its reverse confusion claim. It is true that the district court's opinion does not contain the phase "reverse confusion," and the district court only cites the *Lapp* factors as they are applied to

direct confusion claims. 333 F. Supp. 2d at 245. In UTN's view, this means that we must reverse and remand for a correct analysis of the *Lapp* factors to UTN's claim.

At first blush, there is some support for UTN's position. In *A&H V*, we said:

> Because the District Court failed to undertake the *Lapp* analysis with respect to A & H Sportswear's reverse confusion claim, we must vacate the judgment and remand to the District Court for a redetermination of those factors that receive different treatment under direct and reverse confusion theories, and for a reweighing of all of the factors once those redeterminations have been made.

237 F.3d at 236. However, a closer reading of *A&H V* establishes that we did not create a bright-line rule requiring reversal and remand whenever a district court fails to properly apply the *Lapp* factors. Rather, we there explained:

> The District Court interpreted our precedents to require a two-step inquiry, engaging in the *Lapp* factors only after an initial assessment that the disparity in commercial strength reached a high threshold. Because the degree of commercial disparity that the court believed was required was not met, the court did not even examine whether there existed a likelihood of confusion.

27

*Id*. at 208. Indeed, we noted in *A&H V* that if the record supported a finding that the plaintiff could not succeed on a reverse confusion claim as a matter of law, we would "be bound to explicate our reasoning and affirm the judgment of the district court." *Id.* at 236. Moreover, it is a long-established principle of appellate review, that "we may affirm a correct decision of the district court on grounds other than those relied upon by the district court." *Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1107 (3d Cir. 1996). Thus, the district court's purported failure to apply the *Lapp* factors does not necessarily mandate reversal and remand.

Moreover, we have serious doubts that UTN's claim is really a claim of reverse confusion to begin with. The essence of reverse confusion is that the more powerful junior user saturates the market with a similar trademark and overwhelms the smaller senior user. *Fisons*, 30 F.3d at 474. The "relatively large advertising and promotion of the junior user . . . is the hallmark of a reverse confusion case." *A&H V*, 237 F.3d at 231 (quoting 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23-10, at 23-37. "The question . . . is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Checkpoint Systems*, 269 F.3d, at 303 (internal quotation marks omitted).

Here, Chase did not overwhelm UTN's FREEDOM CARD at all. It is undisputed that CompuCredit FREEDOM CARD was not promoted or marketed after December 2001. Thus, FREEDOM CARD was out of the market for more than

28

a year before Chase launched the CHASE FREEDOM card on January 27, 2003. We are therefore hard-pressed to understand how CHASE FREEDOM card could have overwhelmed UTN's FREEDOM CARD when FREEDOM CARD was not even participating in the market when CHASE FREEDOM was launched. Moreover, any claim that Chase heavily promoted and advertised CHASE FREEDOM card and thereby overwhelmed UTN's FREEDOM CARD via marketing and promotion would be fanciful at best. On the contrary, Chase published a single advertisement for CHASE FREEDOM in a single publication on a single day. Chase thereafter stopped its marketing and advertising efforts once it was contacted by Buford of UTN. UTN attempts to extend Chase's marketing efforts by pointing to the aforementioned news article in *Newsweek* magazine that reported about the CHASE FREEDOM card. However, even if Chase is somehow deemed responsible for "planting" and/or exploiting that article, it would still only amount to an additional one-paragraph news item. Even when combined with the single advertisement in the *Wall Street Journal*, that would hardly support a claim that Chase created confusion in the market by overwhelming FREEDOM CARD, the senior mark.

Nevertheless, "if we were to create a rigid division between direct and reverse confusion evidence, we would run the risk of denying recovery to meritorious plaintiffs." *A&H V*, 237 F.3d at 233 (internal quotation marks omitted). Accordingly, despite real doubts about whether UTN's claim can properly be characterized as a claim of reverse confusion, we must nevertheless determine whether the district court properly applied the *Lapp* factors to it.

UTN contends that the district court failed to properly analyze the similarity of the marks; the strength of the marks; and any facts indicating that the parties will expand into each other's markets. UTN also contends that the district court erred in analyzing some of the remaining *Lapp* factors including: consumer care when making a purchase; actual confusion; and intent. We will therefore address each of those claims of error.

## A. Similarity of the marks.

As we noted above, inquiry into similarity of the marks is the same in cases of reverse confusion and direct confusion. Here, Chase's FREEDOM card also includes the housemark "CHASE."[19] Chase claims that any possible potential for confusion with UTN was substantially reduced because "CHASE" appears together with "FREEDOM" on the face of the card, and the district court agreed.

> The district court explained:
> Given that Chase is a well-known provider of financial services, I agree that the inclusion of the CHASE housemark with FREEDOM (or FREEDOM card), in connection with credit cards and credit card services is enough to lessen any likelihood of confusion between the two marks and render the CHASE FREEDOM and

---

[19]A "housemark" is a company's corporate name. Eric J. Lubochinski, *Hegel's Secret: Personality and the Housemark Cases*, 52 Emory L.J. 489, 490 (2003).

FREEDOM CARD marks dissimilar.

333 F. Supp. 2d at 246.

The district court therefore concluded that the presence of Chase's housemark mitigated any potential for market confusion. However, UTN correctly argues that the junior user's housemark can aggravate reverse confusion by reinforcing the association of the trademark exclusively with the junior user to the detriment of the smaller senior user. *A&H III*, 166 F.3d. at 230. UTN believes that the district court ignored the fact that Chase's housemark reinforced consumers' association of "Freedom" exclusively with Chase, and therefore increased the likelihood of reverse confusion. We disagree.

The district court's holding was based partly on UTN's own admissions about the widespread commercial use of the word "freedom." We have already explained that UTN made certain representations in connection with its two registrations for FREEDOM CARD. We have noted that the USPTO initially rejected UTN's applications because of the likelihood of confusion with Parker Oil's prior registration for its "Fuel Freedom Card," and UTN responded by entering into a Consent Agreement with Parker Oil in which UTN and Parker Oil agreed that there was no likelihood of confusion between UTN's FREEDOM CARD and Parker's Fuel Freedom Card.

As we have also noted above, UTN overcame objections to additional "freedom" marks it applied for by submitting a one-inch thick exhibit of numerous other "freedom" marks to the USPTO. UTN argued that those marks, together with third-

31

party marks cited by the USPTO, were "all existing together in the marketplace" and as a result, "no one has the exclusive right to use the word 'FREEDOM' alone." UTN also represented that, because of such third-party use, the addition of the term "fuel" "creates a significantly different commercial impression than the cited registration [sic] and applications, and thus is not so similar as to preclude its registration."

The district court viewed UTN's representations to the USPTO through the lens of judicial estoppel.[20] *Chase*, 333 F. Supp. 2d at 246. Whether we view the district court's treatment of UTN's prior representations about the commercial availability of marks containing the word "freedom" as judicial estoppel, an admission, waiver, or simply hoisting UTN by its own petard, we agree with the district court's conclusion about the commercial impact of "freedom" in the two marks at issue here. Thus, UTN's own statements and actions, together with Chase's undisputed evidence of the widespread and common use of "freedom," undermine UTN's belated attempt to establish likelihood of confusion from the juxtaposition of "FREEDOM" and Chase's housemark. *See SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 1043 (Fed. Cir. 1983).

## B. Strength of the marks.

In analyzing the strength of UTN's mark, the district court wrote:

---

[20]*See In re Chambers Development Co.*, 148 F.3d 214, 229 (3d Cir.1998), for a discussion of judicial estoppel.

32

UTN has not come forward with any evidence of the commercial strength of the FREEDOM CARD mark, i.e., the amount of money that it spent on advertising, whether it took any steps to increase public recognition of the FREEDOM CARD mark, and whether the public does, in fact, recognize the FREEDOM CARD mark. In fact, the evidence strongly indicates that there is no commercial strength to UTN's mark. At its peak, UTN had 28,193 cardholders. That was three years ago. UTN only issued cards for one year. Given these facts, it is hardly surprising that UTN has chosen to offer no evidence at all of commercial strength. There is none, and this factor weighs against a finding of likelihood of confusion.

333 F. Supp. 2d at 248. The district court also found that the conceptual strength of UTN's mark was weak, *Chase*, 333 F. Supp. 2d at 248, and UTN does not dispute that finding. Rather, UTN argues that the district court erred in focusing only on the commercial weakness of UTN's mark. We agree that the weakness of the senior user's mark can, in theory, advance a claim of reverse confusion rather than undermine it. The "the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." *A&H V*, 237 F.3d at 231 (citation omitted). Nonetheless, "analysis of the strength of the senior user's mark is relevant" in a reverse confusion case. *Checkpoint Systems*, 269 F.3d at 303.

Here, UTN failed to produce any evidence of the commercial strength of its mark and tries to explain that failure by claiming that "it was the strength of the mark of the corporate giant, Chase, that essentially drove [UTN] from the marketplace." Appellants' Br. at 30. However, that is a frivolous rejoinder. As we have already discussed, Chase did not drive UTN out of the marketplace in the first place. Rather, UTN stopped marketing and issuing FREEDOM CARD more than a year before CHASE FREEDOM card was launched.

## C. Sophistication of consumers.[21]

The district court concluded that consumers "do exercise considerable care in selecting who will carry their debt [, and held that ] [t]his factor therefore also weighs against a finding of likelihood of confusion." 333 F. Supp. 2d at 249. In doing so, the court relied in part upon *First Nat'l Bank in Sioux Falls v. First Nat'l Bank South Dakota*, 153 F.3d 885, 888-89 (8th Cir. 1998). There, the court explained that consumers generally exercise a high degree of care in choosing banking services. They are therefore more likely to notice what, in other contexts, may be relatively minor differences in names. This would undermine UTN's likelihood of confusion over these marks.

---

[21]This issue was discussed in the district court's analysis of *Lapp* factor (3), i.e., the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase. This factor is the same for both direct and reverse confusion.

34

The district court also relied upon the testimony of Chase's expert, Pierce Sioussat.[22] He stated that consumers "do look to a number of factors when considering whether to apply for and carry a credit card, such as interest rate, rewards offered, affinity relationship, and introductory offers." *Id.* at 248.

UTN believes this was error because Sioussat's testimony "had no application in the sub-prime market targeted by [UTN]." Appellants' Br. at 30. Admittedly, we have explained that "[w]here the buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991). However, UTN never made this argument in the district court. Rather, UTN only argued that Sioussat's testimony was "absurd and unsupportable" and asserted, without offering any substantive evidence, that while consumers exercise care in choosing their bank, they do not necessarily exercise the same care in choosing a credit card. *Chase,* 333 F. Supp. 2d at 248-49. Accordingly, UTN cannot now argue that the district court erred in relying upon the expert's testimony about the amount of care exercised in the relevant market. *See, e.g., Bailey v. United Airlines*, 279 F.3d 194, 204 (3d Cir. 2002).

---

[22] Sioussat was offered as an expert in the credit card industry. UTN filed a *Daubert* motion to exclude his testimony. *See Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 580 (1993). However, the district court denied that motion, 333 F. Supp. 2d at 249 n.17, and UTN is not challenging that ruling.

## D. Actual confusion.

The district court concluded that "UTN [did] not come forward with any competent evidence of actual confusion. Thus, this factor also weighs significantly against a finding of likelihood of confusion."[23] 333 F. Supp. 2d at 249-50. UTN argues that this was error because the district court (1) ignored the length of time that it had used the mark and (2) ignored anecdotal evidence of actual confusion.

UTN faults the district court's concern over the absence of evidence of actual confusion, reminding us that it was driven from the marketplace. However, that is yet another frivolous rejoinder since UTN stopped marketing the FREEDOM CARD approximately one year before Chase introduced its CHASE FREEDOM card. Chase's short-lived launch of its card, and its willingness to stop marketing CHASE FREEDOM immediately after being contacted by UTN, is uncontradicted. Moreover, even if we credit UTN's claim that CompuCredit refused to continue its relationship with UTN because of Chase's CHASE FREEDOM card, UTN could still not prevail on this record because UTN and Chase were in different markets. The district court found that "the undisputed evidence in this case indicates that [CHASE FREEDOM] and [FREEDOM CARD] are targeted at different groups of consumers. . . . Mr. Buford, UTN's CEO, made the distinction saying, 'Chase is targeting the high-income level and FreedomCard is targeting the middle-

---

[23]The district court considered the fourth and sixth *Lapp* factors together in its actual confusion inquiry.

36

to-low income level.'" *Chase Manhattan Bank*, 333 F. Supp. 2d at 250. Absent more than appears here, this seriously undermines UTN's claim of likelihood of confusion.

Nevertheless, UTN attempts to argue the significance of anecdotal evidence of actual confusion that it introduced. UTN claims that the district court ignored evidence that UTN's accountant, Richard Moon, believed that CHASE FREEDOM was a joint venture between UTN and Chase. However, the district court did not credit that evidence because it was based on Buford's deposition testimony rather than anything Moon testified to. UTN had every opportunity to explore that issue during Moon's own deposition but refrained from doing so. UTN now invites us to ignore Moon's silence and focus on Buford's uncorroborated and self serving proclamations. That is an invitation we must decline.

Moreover, the district court correctly concluded that Moon's purported belief was not sufficient to establish actual confusion even if credited. 333 F. Supp. 2d at 249 n.18. ("Even accepting as true that Mr. Moon was confused, such *de minimis* evidence of actual confusion does not establish a genuine issue of material fact on the likelihood of confusion issue and is insufficient to prevent dismissal on summary judgment.") (citing *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527, 1535 (10th Cir. 1994)).

UTN correctly reminds us that anecdotal evidence can be both relevant and probative, and argues the district court improperly dismissed the anecdotal evidence of Moon's confusion. Appellants' Br. at 34 ("in addressing the actual

37

confusion factor, courts must often consider anecdotal evidence.").  That argument ignores the fact that, unlike the cases UTN relies upon, the anecdotal evidence here was *de minimis* just as the district court concluded.  Accordingly, we do not think the district court erred in analyzing the evidence of actual confusion on this record.

### E.  Chase's Intent in Adopting the CHASE FREEDOM Mark.

The district stated that "UTN has not set forth any competent evidence to prove that Chase adopted the CHASE FREEDOM mark with the intent to confuse consumers." *Chase Manhattan Bank*, 333 F. Supp. 2d at 350.  The court concluded that the evidence here establishes that:

> Chase created the CHASE FREEDOM mark by hiring outside consultants, conducting qualitative research that included focus groups, and forming a team from its internal staff to facilitate the development of a new credit card product.  On the basis of that research, Chase adopted the CHASE FREEDOM credit card to replace the CHASE Shell Mastercard.

*Id*.  The court reasoned that this factor weighs against a finding of likelihood of confusion.  *Id.*  UTN argues that this is error because the district court "failed to address a significant volume of evidence establishing [Chase] had full knowledge of the "FREEDOM CARD" mark."  Appellants' Br. at 36.

38

UTN attempts to advance that contention by correctly noting that the intent inquiry in a reverse confusion case differs from an intent inquiry in a direct confusion case. However, UTN's argument is misleading. As noted earlier, intent to confuse is relevant to both reverse confusion and direct confusion. *A&H V*, 237 F.3d at 232. The difference is that the tenor of the intent to confuse evidence changes from the deliberate intent to palm off or exploit the goodwill of the senior user's mark (deliberate confusion), *id.* at 225-26, to the deliberate intent to push the senior user out of the market (reverse confusion). *Id*. at 232.

There is no evidence here from which a reasonable fact finder could conclude that Chase intended to push UTN out of the market, and this is true even if we assume *arguendo* that Chase was in UTN's market. To reiterate, Chase was in the prime market, and UTN was in the sub-prime market (or the sub-sub-prime market as Chase suggests). UTN never attempted to promote its card in the credit market for Chase's card, and vice-versa.[24] Moreover, as we have repeatedly noted, UTN was not issuing or marketing its FREEDOM CARD in any market when Chase started its CHASE FREEDOM card, and Chase stopped marketing its card when UTN objected. Thus, even if we credit UTN's claim that Chase was considering entering UTN's market and improperly relied on UTN's mark in order to enter it (a true case of reverse confusion), the record

---

[24] Indeed, given the 140% annual charges in interest and fees, UTN's card would have been a "hard sell" to credit-worthy consumers.

39

would still not allow a reasonable fact finder to conclude that Chase's mark created a likelihood of confusion.

In responding to the district court's analysis of intent, UTN first argues that the district court ignored the fact that Chase conducted a trademark search, learned of UTN's FREEDOM CARD mark and nevertheless adopted the CHASE FREEDOM mark. UTN claims that this demonstrates that Chase used the word "freedom" with the intention of confusing consumers.[25]

We disagree, and again note UTN's own USPTO filings about the prevalence of "freedom" in the marketplace. Given UTN's own submissions to the USPTO we agree that the district court correctly concluded that Chase's use of the word does not constitute evidence of an intent to deceive.[26]

---

[25]Chase claimed attorney-client privilege with respect to the trademark search. UTN suggests that Chase's assertion of the privilege constitutes evidence of Chase's bad faith. However, we agree that it is improper to draw an inference of bad faith from the assertion of the attorney-client privilege. *See* Chase's Br. at 44 (citing *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 220 U.S.P.Q. 609, 612 (D. Mass.), *aff'd* 718 F.2d 1201 (1st Cir. 1983).

[26] We do not rule out the possibility that, in an appropriate case, a party could establish that a competitor's use of a common word could constitute evidence of an intent to deceive. However, this record does not support any such inference with

We are similarly unimpressed by evidence that Chase conducted a trademark search and presumably learned of UTN's registration of FREEDOM CARD. Absent UTN's own filings with the USPTO, it might be possible to claim that Chase's search and subsequent use of "FREEDOM" constituted carelessness at best. However, we have not yet adopted that standard for such an analysis, and we are certainly not willing to adopt it on this record. *See A&H V*, 237 F.3d at 232-33 ("Although we recognize that our opinion in *Fisons* perhaps implied that mere carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion case, we are reluctant to adopt such an interpretation, as it would be manifestly out of step with our prior holdings regarding the relevance of 'intent' in trademark infringement claims."). However, given the undisputed evidence of how common the use of "freedom" has become in the relevant marketplace, even that requires an analytical stretch beyond the reach of a reasonable fact finder.

UTN next argues that Chase intentionally adopted the word "freedom" to confuse consumers because Chase knew in 1999 that UTN had FREEDOM CARD. That argument is rooted in the discussions that occurred after UTN approached Chase to explore possible affiliation with UTN's FREEDOM CARD. UTN alleges that at a meeting, it gave Chase graphic copies of a credit card that is virtually identical to the CHASE FREEDOM card. Although UTN makes this allegation, at his deposition, Buford could not say when the presentation was

regard to Chase's use of "freedom."

41

made. Moreover, it is undisputed that no such card exists in Chase's files. Finally, as we noted above, even if UTN could establish when this happened, it would still not establish the likelihood of confusion that UTN had to establish to prevail on its counterclaim.

UTN suggests that intent to confuse can be inferred because certain Chase employees were involved in both the 1999 discussions between UTN and Chase and a subsequent project that Chase undertook in 2002-2003 called "Project Poet" that led to the development of the CHASE FREEDOM card. According to UTN, an employee named "Dzierzynksi" told other Chase employees in 1999 that they needed to followup on a Chase-FREEDOM CARD joint venture and that she was a member of the Project Poet team. UTN cites to e-mails to support that connection. However, Dzierzynski was not the author of those e-mails; she was only a recipient. Moreover, Dzierzynski was not a member of Project Poet and had no involvement in the development of CHASE FREEDOM.

UTN further alleges that a person named "Dias," a Chase executive who was present at the 1999 meetings, briefed her supervisor, "Johri," on all of her projects and that Johri was later a member of Project Poet. However, Dias left Chase long before Chase began Project Poet and Johri did not work for Chase until September 1, 1999, after all discussions with UTN ended. Chase concedes that Johri met with Dias for 15-20 minutes when he first joined Chase; however, UTN produced no evidence that Dias told Johri about the UTN-Chase discussions. The district court realized that UTN needed more

42

than these largely unsupported conclusions to survive Chase's motion for summary judgment.

Moreover, these meetings and discussions still cannot overcome the other problems with UTN's proof detailed above. We therefore find UTN's argument regarding the 1999 discussions between UTN and Chase unpersuasive.

## F. Other factors.[27]

We have noted that *Lapp* factor (10) is necessarily transformed in the reverse confusion context to an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

*A&H V*, 237 F.3d at 234 (citation omitted). UTN argues that the district court erred in applying this factor because it "gave no consideration to whether the consuming public might expect [Chase] to (a) offer both the FREEDOM CARD and the CHASE FREEDOM CARD, (b) offer a card for the subprime market, or (c) enter the subprime market." Appellants' Br. at 22-23. However, that is the sum of UTN's argument on this point. UTN does not attempt to demonstrate how such an inquiry would have resulted in finding a likelihood of confusion, nor does UTN discuss how the district court's failure

---

[27]This argument centers on *Lapp* factor (10).

43

to conduct the inquiry prejudiced it.

> UTN does claim that
>
> > the consuming public clearly might expect [Chase] to produce a credit card product, including a credit card product for the subprime market served by FREEDOM CARD. In that regard, it is undisputed that [Chase was] investigating the subprime market following its meetings with FREEDOM CARD in 1999.

UTN's Br. at 25. However, this statement is not correct. There was undisputed deposition testimony that Chase was preparing, but had not yet started, some targeted testmarketing in the subprime market. However, that activity took place in 2004, not when Chase and UTN met in 1999. Moreover, the record does not establish that any such entry would have involved the CHASE FREEDOM mark; a mark that Chase discontinued in 2003. In addition, Chase and UTN defined the sub-prime market very differently. CHASE defined the sub-prime market as consumers with a credit score lower than 660 with no bankruptcies. UTN defined that market as consumers having credit scores below 580 with recent bankruptcies. *See* n.6, *supra*.

### G. Failure to address all of the *Lapp* factors.

Finally, UTN argues that the district court failed to address *Lapp* factor (9) – the relationship of the goods in the minds of consumers because of the similarity of function.

44

According to UTN, this failure, in and of itself, warrants reversal and remand. In support of that contention, UTN relies on *Kos Pharmaceuticals*, 369 F.3d at 711-12. There, we said that if a district court finds that certain of the *Lapp* factors do not apply or do not further the inquiry, the court should explain why it did not use those factors in arriving at its decision. In *Kos*, the district court only considered two of the *Lapp* factors and simply said that the "remaining *Lapp* factors do not [weigh in the Petitioner's favor]." *Id.* at 712. We held that this statement "does not explain the basis for [the district court's] holding as to each factor, whether it viewed each as neutral, irrelevant, or favorable to Andrx, or how it weighed and balanced the combined factors." *Id.*

However, this does not help UTN now because UTN and Chase agreed in the district court that *Lapp* factors (1) through (6) and (8) were the most relevant factors for the district court to analyze. *Chase*, 333 F. Supp. 2d at 245 n.14. ("the parties agree that, because their goods compete in the same field, the most relevant *Lapp* factors are (1) through (6) and (8)."). UTN cannot fault the district court for not analyzing its claim under factor (9) when it agreed that that factor was of dubious relevance. The district court explained it was not discussing *Lapp* factors 7, 9, and 10 because they "are not apposite for directly competing goods. . . ". *Id.* Moreover, UTN does not even now discuss how the district court's failure to address any factor, including factor (9), resulted in prejudice or altered the outcome in this case.

## V. CONCLUSION

45

For all of the above reasons, we will affirm the district court.